Roland ROGERS, on his behalf and all African American voters as a class whose voting rights are effected by this matter, Plaintiff,

v.

NEW YORK CITY BOARD OF ELECTIONS, New York City Campaign Finance Board, WABC–TV, NY–1 TV, WCBS–TV WNBC–TV and WNET–TV, Defendants.

No. 97 Civ. 6609(SAS).

United States District Court, S.D. New York.

Dec. 29, 1997.

Roland Rogers, New York City, pro se.

Jeffrey Friedlander, Paul Marks, Corporation Counsel of the City of New York, New

York City, for defendant New York City Board of Elections.

Nicole A. Gordon, Laurence Laufer, Karen Zweig, New York City Campaign Finance Board, New York City, Vaughn C. Williams, Ken Gross, New York City, for defendant New York City Campaign Finance Board.

Saul B. Shapiro, Patterson, Belknap, Webb & Tyler, New York City, for defendant WABC–TV.

Jay E. Gerber, Davis Weber & Edwards P.C., New York City, for defendant New York 1 News.

Jacquelyn J. Orr, Litigation Counsel, New York City, for defendant CBS, Inc.

Daniel M. Kummer, Litigation Counsel, New York City, for defendant National Broadcasting Company, Inc.

Eleanor S. Applewhaite, Vice President, General Counsel & Secretary, New York City, for defendant WNET.

*OPINION AND ORDER*

SCHEINDLIN, District Judge.

Plaintiff Roland Rogers ("Rogers"), an African–American candidate for the office of Mayor or the City of New York, claims that he was unfairly excluded from participating in public televised debates sponsored by defendant the New York City Campaign Finance Board. As a result, he filed a Complaint on September 8, 1997, alleging that defendants had violated his rights under the First and Fourteenth Amendments to the United States Constitution, the Voting Rights Act of 1965, 42 U.S.C. § 1971–1974(e) (1997), and the Civil Rights Act of 1963, 42 U.S.C. § 2000, *et seq.* (1997). Plaintiff sought a temporary restraining order enjoining the Democratic primary for the New York City mayoral election. After a brief hearing, this relief was denied, and the primary was held as scheduled on September 9. On September 16, plaintiff sought a preliminary injunction setting aside the results of the primary. This relief was also denied. All defendants have now moved to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). For the following reasons, defendants' motions are granted.

## I. Factual Background

For the purposes of these motions, the following allegations are assumed to be true. On May 23, 1997, Rogers filed the forms required to permit him to run for the office of Mayor of New York City in the November, 1997 election. These forms were filed with defendant New York City Board of Elections. Upon being informed that his status as a potential candidate did not automatically enroll him in the City's matching funds campaign finance program ("the program"), Rogers visited the offices of defendant New York City Campaign Finance Board ("Campaign Finance Board"), the entity responsible for administering the program. *See* Complaint ("Cmplt.") at ¶¶ 10–11. The receptionist there refused him an application for the program on the ground that the deadline for consideration of such applications had expired on April 30, 1997. *See id.* at ¶ 11. Rogers was further informed that exclusion from the program also meant exclusion from two debates to be sponsored by the Campaign Finance Board ("the debates"), debates which were subsequently held on August 19 and September 7, 1997, and broadcast by defendants New York 1 News and WABC–TV, respectively. *See id.* at ¶ 12.

As a result of Rogers' inability to participate in the program, he was not considered an "official" candidate by the media, and was therefore excluded from a number of other televised debates. *See id.* at ¶ 13. It should be noted that while the Complaint lists "all African American voters as a class whose voting rights are effected [sic] by this matter" as co-plaintiffs, the Complaint does not allege that any of the defendants' complained of acts had a racially discriminatory effect or purpose, nor does it make any class allegations whatsoever. *See* Cmplt. at ¶¶ 10–13. Moreover, at the preliminary injunction hearing, Rogers stated explicitly that he was not alleging that the April 30 deadline had a racially discriminatory effect or purpose.[1]

---

**1.** In pertinent part, the transcript from that hearing reads as follows:

THE COURT: ... I am a little confused by the race aspect of ... being barred from the de-

## II. Legal Standard for Motion to Dismiss

In deciding a 12(b)(6) motion to dismiss, the court must accept as true material facts alleged in the complaint and draw all reasonable inferences in the nonmovant's favor. *See Kaluczky v. City of White Plains*, 57 F.3d 202, 206 (2d Cir.1995). Such a motion cannot be granted simply because recovery appears remote or unlikely on the face of a complaint, because "[t]he issue is · not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Bernheim v. Litt*, 79 F.3d 318, 321 (2d Cir.1996) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974)). Rather, dismissal can only be granted if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bernheim*, 79 F.3d at 321 (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101, 2 L.Ed.2d 80 (1957)).

## III. Discussion

### A. Voting Rights Act Claim

Rogers first contends that the April 30 deadline imposed by the Campaign Finance Board violates § 5 of the Voting Rights Act of 1965 in that it was not pre-cleared by the Attorney General or the District Court for the District of Columbia pursuant to the procedure described in 28 U.S.C. § 1973(c). In pertinent part, that section provides:

Whenever a State or political subdivision subject to § 1973 regulation] shall enact ... any [new] voting qualification or prerequisite to voting, or standard, practice or procedure with respect to voting ... such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification ... does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color ... and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification....

I note that New York and Bronx counties are subject to the requirements of § 1973(c). *See* 52 Fed.Reg. 486, 499 (1987). I will assume for the purposes of this motion that the April 30 deadline is a "standard, practice or procedure with respect to voting" within the meaning of the statute, and that pre-clearance for it was not obtained. *See* Cmplt. at ¶ 21. I nevertheless find that the Complaint fails to state a claim upon which relief can be granted in that it does not allege that "race or color" had anything to do with the imposition, administration or effect of the deadline.[2] As the Supreme Court has indicated, the Voting Rights Act was created

to make the guarantees of the Fifteenth Amendment finally a reality for all citizens. Congress realized that existing remedies were inadequate to accomplish this purpose and drafted an unusual, and in some

---

bate. Does Mr. Rogers as a candidate assert that because he is African–American he wasn't allowed to meet the April 30th deadline and therefore ... wasn't allowed in the debate? ... I wonder if you are arguing that somehow he was barred from meeting the deadline because he is black, because he is African–American. Is that your argument?

MR. PICCOLO (a non-lawyer speaking for Rogers): No.

. . . .

THE COURT: ... But you are not arguing that the deadline was missed because of the candidate's race?

MR. PICCOLO: No.

. . . .

THE COURT: ... I am only saying the regulation issue is race-neutral. Every candidate had to do it by April 30th or not. The result is what you are challenging, the result of that.

MR. PICCOLO: ·That it is arbitrary and capricious.

THE COURT: Yes, I understand that. But it is race-neutral. Any candidate could have missed that deadline. And the same result would have flowed.

MR. PICCOLO: Yes, your honor.

Transcript of Preliminary Injunction Hearing and Decision, September 16, 1997 at 19–21.

**2.** Had Rogers alleged a racial purpose or effect in the City's alleged failure to obtain preclearance for the April 30 deadline for admission into the program, the question of whether preclearance was indeed required would have required additional briefing by the parties. It is not certain, in fact, that preclearance was required.

aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws.

*Allen v. State Bd. of Elections,* 393 U.S. 544, 556, 89 S.Ct. 817, 826, 22 L.Ed.2d 1 (1969). The Supreme Court has also recognized that § 1973(c) imposes a heavy burden on the states, and indeed on the basic principles of federalism: Only the "unremitting attempts by some state and local officials to frustrate their citizens' equal enjoyment of the right to vote," justifies the statute's "extraordinary departure from the traditional course of relations between the States and the Federal Government." *Presley v. Etowah County Comm'n,* 502 U.S. 491, 500–01, 112 S.Ct. 820, 827, 117 L.Ed.2d 51 (1992) (citing *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)).

In light of these concerns, there is simply no reason to bring the "extraordinary" and "severe" remedy provided by § 1973(c) to bear when no one, *not even the plaintiff,* believes that the challenged rule has anything to do with the policies underlying the Voting Rights Act. The Act was intended to combat the "insidious and pervasive evil" of racially discriminatory election practices, *Katzenbach,* 383 U.S. at 308, 86 S.Ct. at 808, not to lay a formalistic trap for States that may fail to follow the letter of its procedural requirements in amending their electoral rules. Therefore, a Complaint— like the one filed by Rogers—that makes no mention at all of racial animus cannot state a claim under the Voting Rights Act.

**B. Civil Rights Act Claim**

Rogers also contends that the defendants have violated his rights under the Civil Rights Act of 1964. That statute prohibits discrimination on the basis of "race, color, religion, or national origin," in a variety of contexts. *See, e.g.,* 42 U.S.C. § 2000a(a) (1997) ("All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation ... without discrimination or segregation on the ground of race, color, religion, or national origin."). However-

er, as noted earlier, plaintiff has not alleged that he was excluded from the program or the debates because of his race, color, religion, or national origin, but rather because he missed the deadline for inclusion in the program. *See* Cmplt. at ¶¶ 10–13. The Civil Rights Act is not intended to provide a universal remedy for all the unfairnesses of life; its exclusive concern is with discrimination based on the grounds it enumerates. *See Seidenberg v. McSorleys' Old Ale House, Inc.,* 317 F.Supp. 593, 595 (S.D.N.Y.1970) (discrimination on the basis of sex not prohibited by 42 U.S.C. § 2000a(a)); *DeCrow v. Hotel Syracuse Corp.,* 288 F.Supp. 530, 532 (N.D.N.Y.1968) (same). Therefore, Rogers has failed to state a claim under the Civil Rights Act.

**C. First and Fourteenth Amendment Claims**

Rogers' third claim is that his exclusion from the program and the debates deprived him of rights guaranteed by the First and Fourteenth Amendments. The Supreme Court has held that "[t]he impact of candidate eligibility requirements on voters implicates basic constitutional rights," including the right of individuals to associate for the advancement of political beliefs and the right of voters to cast their votes effectively. *Anderson v. Celebrezze,* 460 U.S. 780, 786–87, 103 S.Ct. 1564, 1568–69, 75 L.Ed.2d 547 (1983). While the challenged deadline did not prevent Rogers from getting on the primary ballot, his exclusion from the program's debates, and his subsequently reduced ability to make himself known to voters, implicated those rights, albeit in a tangential manner. *See id.* ("[I]n approaching candidate restrictions, it is essential to examine in a realistic light the extent and nature of their impact on voters.") (quoting *Bullock v. Carter,* 405 U.S. 134, 143, 92 S.Ct. 849, 855, 31 L.Ed.2d 92 (1972)).

The Supreme Court has recently restated the test to be applied when election laws are subjected to challenge on First or Fourteenth Amendment grounds. Courts hearing such claims must "weigh the character and magnitude of the burden the State rule imposes on [First and Fourteenth Amendment]

rights against the interests the State contends justify that burden, and consider the extent to which the State's concerns make the burden necessary." *Timmons v. Twin Cities Area New Party,* —— U.S. ——, ——, 117 S.Ct. 1364, 1370, 137 L.Ed.2d 589 (1997) (internal quotation marks omitted). Regulations that impose "severe burdens on plaintiffs' rights must be narrowly tailored and advance a compelling state interest. Lesser burdens, however, trigger less exacting review, and a State's 'important regulatory interests' will usually be enough to justify 'reasonable, nondiscriminatory restrictions.'" *Id.* (quoting *Burdick v. Takushi,* 504 U.S. 428, 434, 112 S.Ct. 2059, 2063, 119 L.Ed.2d 245 (1992)).

The program's April 30 application deadline imposes an extremely minor burden on the right to vote. Rogers admits that he was "unusually late" in applying for the program on May 23, *see* Cmplt. at ¶ 10, and I take judicial notice of the fact that many other candidates were able to meet the deadline. Furthermore, as noted above, Rogers does not allege that he was denied access to the ballot as a result of the deadline; in fact, he attaches to his Complaint a document that purports to show his name on the ballot for the Democratic mayoral primary held on September 9, 1997. *See* Cmplt. at Exhibit A. Thus, according to the Complaint, the deadline did not deny voters the opportunity to vote for him. *See Timmons,* —— U.S. at ——, 117 S.Ct. at 1372 (upholding election law that did not "*directly* limit the [plaintiff's] access to the ballot.") (emphasis added). The Second Circuit has applied a "less exacting review" to voting restrictions far more onerous than this. *See, e .g., Schulz v. Williams,* 44 F.3d 48, 56–57 (2d Cir.1994) (upholding statute that required independent candidates for statewide office—but not candidates from major parties—to gather signatures and other information from 15,000 registered voters over a 42–day period before gaining access to the ballot). Therefore, this deadline should be upheld if it is a "reasonable, nondiscriminatory restriction[ ]" that serves "important regulatory interests." *Burdick,* 504 U.S. at 434, 112 S.Ct. at 2063.

This standard is clearly met. The matching funds program seeks to reduce candidates' dependence on large financial contributions by providing incentives to candidates to abide by certain expenditure, contribution and disclosure requirements. *See* Affidavit of Nicole A. Gordon, Executive Director of the Campaign Finance Board at ¶ 7. This goal is obviously legitimate. *See California Med. Assoc. v. Federal Election Comm'n,* 453 U.S. 182, 197–99, 101 S.Ct. 2712, 2722–23, 69 L.Ed.2d 567 (1981) (campaign contribution limits serve the permissible purpose of "preventing the actual or apparent corruption of the political process."). Moreover, such a program would be useless without a deadline for admission fairly early in the campaign season: Otherwise, candidates' incentives to comply with the program's restrictions would be dramatically reduced. While it is possible that these purposes could have been served just as well by a deadline that extended until May 23rd, the day that Rogers sought admission to the program, there is no "constitutional dimension" to such minor details of otherwise permissible government action. *Burson v. Freeman,* 504 U.S. 191, 210, 112 S.Ct. 1846, 1857, 119 L.Ed.2d 5 (1992) (statute prohibiting political activity within 100 feet of a polling place on election day is not unconstitutional merely because its purposes could conceivably have been served by a smaller restricted area). Finally, there is no allegation in the Complaint that the deadline has a discriminatory purpose or effect beyond the fact that it "discriminates" against those candidates who miss it. *See* Cmplt. at ¶¶ 10–13; *see also Burdick,* 504 U.S. at 437, 112 S.Ct. at 2065 ("[W]e have repeatedly upheld reasonable, *politically* neutral [election] regulations. . . .") (emphasis added). Because the program's April 30th deadline was reasonable, neutral and served an important regulatory purpose, it did not violate Rogers' First or Fourteenth Amendment rights.

## IV. Conclusion

Rogers has not pled that the subject of this dispute—the Campaign Finance Board's April 30, 1997 deadline for admission into its matching funds program—amounted to a violation of the Voting Rights Act of 1965. Fur-

ther, Rogers has not alleged that he was discriminated against on the basis of "race, color, religion, or national origin," and so has not stated a claim upon which relief can be granted under the Civil Rights Act of 1963. He similarly fails to allege that he has been deprived of rights protected by the First and Fourteenth Amendments. Therefore, defendants' motions to dismiss are granted.

SO ORDERED.